Elizabeth **BLACKMONE** and Nathaniel Blackmone, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 2330.

Municipal Court of Appeals for the District of Columbia.

Argued Feb. 2, 1959.

Decided May 13, 1959.

Rehearing Denied May 29, 1959.

I. Irwin Bolotin, Washington, D. C., with whom Morris Benson and Paul F. Dwyer, Washington, D. C., were on the brief, for appellants.

Frank J. Wilson, Asst. U. S. Atty., Washington, D. C., with whom Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before ROVER, Chief Judge and HOOD and QUINN, Associate Judges.

QUINN, Associate Judge.

Congress has established by statute a system to provide for aid to dependent children in the District of Columbia. This system, which is administered by the Department of Public Welfare, grants money payments with respect to a child who has been deprived of parental support or care by reason of death, continued absence from the home, or physical or mental incapacity of a parent. Code 1951, § 32–751 et seq. Code 1951, § 32–765, provides as follows:

"Any adult person who attempts to obtain, or obtains, or aids or assists any child or other person to obtain, by false representation, fraud, or deceit, any allowance under sections 32–751 to 32–765, or who receives for the benefit of any child any allowance knowing it to have been fraudulently obtained, shall upon conviction in the Municipal

Court for the District of Columbia, criminal division, be punished by a fine of not more than $500 or by imprisonment for not more than one year, or by both such fine and imprisonment."

By a 35-count information appellants were charged with 35 violations of the above-quoted statute. It was alleged that appellant Elizabeth Blackmone had represented to the Department of Public Welfare, verbally and in a signed application, that her husband, appellant Nathaniel Blackmone, had deserted her, whereas in fact he had not deserted her. It was charged that, as a result of this misrepresentation, in which the husband unlawfully participated, Elizabeth Blackmone received 35 monthly payments from the Department of Public Welfare, commencing on April 15, 1955. Each payment was the subject of a separate count. It was alleged that appellants received the benefit payments with knowledge that they had been fraudulently obtained. There were also allegations that subsequent to the reception of the first payment Mrs. Blackmone did not notify the Department of Public Welfare of any changes in her living arrangements, contrary to Department regulations requiring such reports.

The court directed the jury to return a verdict for appellants on counts 3 to 35 and submitted the case to the jury on counts 1 and 2, representing the first two payments in April and May 1955. The jury found appellants guilty on each count. Mrs. Blackmone was given a sentence of six months on each count, the sentences to run consecutively, and a fine of $500 on each count, with six additional months in jail on each fine if not paid. Her husband was sentenced on the first count to one year in jail and a fine of $500, with an additional jail term of six months if the fine was not paid. On the second count, he was given six months in jail, to run consecutively with the first sentence, and another fine of $500, or, in the event he failed to pay that fine, an additional six months. This appeal is from all judgments.

Appellants originally filed 56 assignments of error which they reduced to 25 in their brief. In turn, appellants have grouped these allegations into two categories with various subheadings. We shall take up the questions we consider to have the most merit, not necessarily in the order in which they appear in appellants' brief.

The government's evidence disclosed that on April 6, 1955, Mrs. Blackmone applied to a social worker, connected with the Department of Public Welfare, for public assistance for her dependent children, and that she represented orally and on the written application that her husband had deserted her and left her with six small children. In subsequent interviews and on written applications she stated that her husband did not live with her and that he did not have access to the home. On April 13, 1955, another social worker interviewed Mrs. Blackmone in her home. She did not see men's clothing or other evidence that there was a man residing in the house. On April 14, 1955, it was recommended that Mrs. Blackmone be granted assistance.

Pursuant to Code 1951, § 32–754, the Department of Public Welfare has promulgated certain rules and regulations for determining when a child has been deprived of "parental support." In addition to the statutory requirement that the parent in question be continually absent from home,[1] the regulations provide that assistance should be withheld if there is no "clear dissociation from the normal family relationship." There was testimony that under the regulations assistance would not have been granted initially to Mrs. Blackmone if it were known that her husband was either living in, or had free access to, the home at the time of the grant or at any time thereafter, and that assistance would have been stopped immediately if it were found that he had access to, or was visiting the home.

1. Code 1951, § 32–752.

The 35 checks from the Department of Public Welfare, which were made payable to Mrs. Blackmone and which extended over a period from April 1955 to February 1958, were received into evidence without objection. It was stipulated that Mrs. Blackmone received the checks, endorsed them, and cashed them.

There was evidence that Nathaniel Blackmone was employed by local bowling alleys from January 1955 to April 1956. There was also testimony that he was engaged in the trucking business from April 1957 to January 1958 as a partner with one George Hendricks. Both Mr. Hendricks and his wife stated that they reached Blackmone by telephone at a certain number. The records of the telephone company showed that this number was registered in the name of "Maurice Blackmone" and that it was located in the premises occupied by Mrs. Blackmone. Mr. and Mrs. Hendricks also stated that Blackmone had visited them at their home and had brought with him several children whom he introduced as his own.

On the evening of February 7, 1958, three investigators of the Department of Public Welfare went to the house occupied by Mrs. Blackmone. Two of them went to the rear of the premises, and after a short wait, they observed a man running from the rear door in his bare feet and shirt sleeves. The investigators asked him where he was going and requested him to go back into the house with them, which, according to the statement of proceedings and evidence, he did "voluntarily." Inside, they found Mrs. Blackmone and the third investigator, who testified that he had been "admitted" to the premises by Mrs. Blackmone. After some discussion, she stated that the man was her husband. Blackmone then said:

"Well, you've got me boys. My name is Blackmone * * *. I'm here, you can see. I've been here off and on about three years."

While in the house the investigators noticed men's clothing.

Three days later the Blackmones appeared at the office of the Department of Public Welfare by request. Blackmone again stated at that time that he had been in and out of the house for three years.

At the trial Mrs. Blackmone testified in her own behalf and stated that her husband had deserted her on March 19, 1955; that he went to Baltimore to seek employment, telling her he would return in a few days but did not. She also said that he contributed nothing to the support of her or her children in the months of April and May 1955.

Blackmone testified that after leaving his wife in March 1955 he first went to Baltimore for four days and then returned to the District of Columbia; that he did not go back to his wife but stayed with other people at local addresses; and that he had not intended to remain away permanently, or desert his wife and children.

At the outset, we discuss what we consider to be the true nature of the crime charged. As we see it, the statute involved here is violated generally in either of two situations: (1) if a person obtains or assists another in obtaining a public assistance allowance by fraud or misrepresentation; or (2) if a person receives such an allowance with knowledge that it was fraudulently obtained. The crime is completed when "any" allowance is obtained by fraud or when such tainted allowance is knowingly received. But if a second allowance is obtained or received, based on the same fraud, is a second distinct crime committed?

In Bramblett v. United States, 97 U.S. App.D.C. 330, 231 F.2d 489, certiorari denied, 1956, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874, the defendant made a false statement to the disbursing office of the House of Representatives. As a result of this same false statement, a payment of

money was made on each of the following seven months. A seven-count indictment was brought against the defendant under a statute which forbids the making of a false statement in any matter within the jurisdiction of any department or agency of the United States. Each count related to each of the months following the making of the false statement, during which the statement was continued in force and payments were made. The court held that only one offense had been committed, stating:

"\* \* \* The portion of the statute upon which the indictment rests we think does reveal a Congressional intent to reach a pattern of conduct rather than to penalize a series of acts which manifest the pattern. In construing a criminal statute doubts should be resolved in favor of a construction that avoids subjecting an offender to multiple convictions by reason of a single unified pattern of behavior even though the behavior continues over a period of time." [2]

■ We believe that the Bramblett decision is analogous and controlling in the instant case and requires us to hold that only a single crime of a continuing nature was charged here rather than a series of crimes. It is true that the statute involved here, unlike that in Bramblett, contains an additional element, the obtaining or reception of money, but in the absence of an explicit statutory definition that each payment of an allowance is to constitute a separate crime,[3] we do not think this distinction significant. Although this point was not brought out below or in argument here, we raise it on our own motion, for not only does it render appellants' sentences invalid, as we shall presently show, but it also contributed to some confusion in the trial,

and a proper understanding of it is necessary before we take up the assignments of error.

The government apparently based its case mainly on the contention that the claimed desertion, for which the subsistence allowance had been granted, had never occurred; that the Blackmones were aware of this, and both received the tainted allowance. There were also allegations in the information which would indicate that the government was originally taking the alternative position that, if it should develop that Mrs. Blackmone's original representation concerning her husband's desertion was true, at least at the time it was made, nonetheless there was a violation of the statute when the parties sometime thereafter resumed living together and continued to accept the welfare payments without reporting the change in their living arrangements to the Department of Public Welfare. We need not decide whether the statute is broad enough to include this latter situation,[4] however, for it appears to us that the government is no longer relying on this alternative interpretation of the evidence,[5] but instead solely on its first premise. In examining the evidence for sufficiency, then, we will only determine whether it supports the government's first theory of the case.

■ Appellants argue that since the trial judge directed a verdict on counts 3 through 35, for reasons not pertinent here, the jury could only consider evidence bearing on the crimes supposedly committed during the period of April and May 1955. As we have indicated, the offense charged here was not a series of independent acts, but a single general plan or scheme to defraud the Department of Public Welfare. Therefore, the jury would have been entitled to consider all the evidence bearing

2. 97 U.S.App.D.C at page 332, 231 F.2d at page 491.

3. See Bell v. United States, 1955, 349 U.S. 81, 84, 75 S.Ct. 620, 99 L.Ed. 905; Cormier v. United States, D.C.Mun.App. 1957, 137 A.2d 212, 216–217.

4. See State v. Allison, 1952, 173 Kan. 107, 244 P.2d 176, 178.

5. No instruction along these lines was given to the jury.

on this plan, although they were erroneously limited by the court's ruling to finding only that this plan continued for the initial two months.

Appellants contend that the evidence is insufficient to support their convictions. In particular, they argue that there was insufficient corroboration of Blackmone's extrajudicial admission, made to the Department's investigators in February 1958, that he had been in their home "off and on for three years," which would include the crucial period of March 1955 when he supposedly deserted his wife. To show that there was no desertion in March 1955, the government produced proof that Blackmone was locally employed at that time, contrary to his wife's claim that he went to Baltimore. There was ample evidence that Blackmone was living in their home during the period subsequent to March 1955. Blackmone conceded on the witness stand that "he did not intend to desert his wife and children."

■ It is the rule in this jurisdiction that when an element of an offense is sought to be established by an admission, such an admission must be corroborated. However,

"* * * the corroborative evidence need not be sufficient, independent of the admission, to establish the corpus delicti, but the government must introduce substantial independent evidence which would tend to establish the trustworthiness of the admission. The corroboration is sufficient if it supports the essential facts admitted to such a degree that a jury would be justified in inferring that the admission was true. Thus, all the elements of the offense must be established by independent evidence or corroborated admissions and where an element of the corpus delicti is supplied by an admission alone, the prosecution must provide substantial independent evidence to show the trustworthiness of that admission."[6]

It is, of course, conceded that Mrs. Blackmone made the representation in March 1955 that her husband had deserted her, and that as a result of her statement she received various allowances from the Department of Public Welfare. Therefore, the only remaining elements of the offense which the prosecution had to establish were that the statement was made with knowledge that it was false, that Blackmone also knew this, and that he partook of the benefits of the allowances. His extrajudicial admission had the effect of supplying each of these elements: it placed him in the house in March 1955 when he had supposedly deserted, and it indicated guilty knowledge. His presence in the house would warrant the inference that he received and partook of the allowances.

■ Was the admission corroborated sufficiently to be trustworthy? It was shown that in March 1955 he was locally employed, contrary to Mrs. Blackmone's assertion that he went to Baltimore, and that subsequent to March 1955 he was in the house. His testimony on the stand that he did not intend to desert his wife tends to show that no desertion in fact took place. We think this corroborative evidence sufficient to meet the standards set out above, and thus that the total proof supports the convictions.

■ Appellants contend for the first time in their brief here that the entry into their house by the Department's investigators on February 7, 1958, was illegal because made without a search warrant; and that consequently, the evidence thereby obtained, including Blackmone's admission, should have been suppressed. We are urged to notice this point as plain error, although not raised in the trial court. The government argues, apart from the procedural defect, that appellants waived their rights in this regard by inviting the investigators into their

6. Brinker v. District of Columbia, D.C. Mun.App.1956, 122 A.2d 768, 771; see also McGilton v. United States, D.C. Mun.App.1958, 140 A.2d 190.

home. The only evidence in the record on this issue is the statement of one investigator that Mrs. Blackmone "admitted" him, and the testimony of the other investigators that Blackmone "voluntarily" accompanied them into the house. The Blackmones gave no evidence concerning this incident. Failure to raise the question below has indeed left the record almost devoid of evidence of any sort bearing on this contention, and we do not think we could rule that this is plain error on such an inconclusive and sketchy record, and therefore decline to entertain the contention.

Appellants complain that the judge committed several errors in his conduct of the trial which had the cumulative effect of depriving them of a fair hearing. The record shows no objections or protests of this nature were ever made at the trial, and most of the claimed errors we think are without merit.[7] One incident does require discussion. At the conclusion of the first day of trial, the judge inquired of defense counsel, out of the presence of the jury, whether he had any defense to offer in behalf of Mrs. Blackmone. The record then states that the judge

> "* * * expressed strong conviction of guilt on the part of Elizabeth Blackmone with the remark, 'If the jury lets her go, I'll drop dead.'"

 It is the general rule that the mere expression of an opinion as to the guilt of an accused will not *per se* disqualify the judge from trying a case.[8] A judge may form such an opinion and still conduct a trial with the utmost impartiality. To require disqualification, it is necessary to show that the judge's opinion has become so overpowering in his mind as to amount to a personal bias against the defendant.[9]

 We do not think the circumstances here warrant us in holding that the judge was disqualified from presiding further. In the first place, no such request was made below, and is urged here for the first time. In similar situations we have held that the claim comes too late.[10] Secondly, we do not think that the record as a whole shows that the judge had formed a personal bias. The remark was made outside the presence of the jury. The jury were told that they were the "exclusive judges" of the facts, and that any of the court's statements concerning the facts were not binding on them.[11] We cannot find any other statements in the record indicative of bias. Appellants' assertion in their brief that the remark was "too meaningful to have been overlooked by any person remaining in the courtroom and could have been conveyed to the jury," is sheer conjecture and without any record support.

 As we have previously indicated, the offense here was not multiple but single. Nonetheless, we are not for that reason compelled to reverse the convictions outright. The two convictions on both counts, which charged two crimes but were in fact one crime, amounted to a conviction of a single crime,[12] and we therefore affirm one conviction.

The maximum sentence which the court could impose for one offense was one year in jail and a fine of $500. Each appellant has received a sentence in excess of the maximum. Blackmone received a total sentence of 18 months and a total fine of $1,000. Mrs. Blackmone was given 12 months in jail and a fine of $1,000. We will therefore remand the case for resentencing.[13]

In their brief appellants have attacked the validity of their sentences on grounds other

7. Cf. Bolden v. United States, D.C.Cir., 266 F.2d 460.

8. Annotation, 45 L.R.A.,N.S., 511.

9. Whitaker v. McLean, 1941, 73 App.D.C. 259, 118 F.2d 596.

10. Lyons v. Sockwell, D.C.Mun.App., 1952, 91 A.2d 847, 848, and cases cited.

11. See Bolden v. United States, supra, note 7.

12. Bramblett v. United States, supra, note 2, 97 U.S.App.D.C. at pages 332–333, 231 F.2d at pages 491–492.

13. Ibid.

than those we have just discussed. In view of our present disposition of the case, we need not consider these arguments at this time.

Reversed and remanded for resentencing in accordance with this opinion.