**Yasmeen ABDULSHAKUR, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 88–1134.**

District of Columbia Court of Appeals.

Argued Jan. 2, 1991.
Decided April 25, 1991.

Ronald L. Webne, Alexandria, Va., appointed by this court, for appellant.

Mary L. Wilson, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Philip Clarke Baten, Washington, D.C., filed a brief for three Jane Does, amici curiae, urging reversal.

Before ROGERS, Chief Judge, and SCHWELB, Associate Judge, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

On June 29, 1988, following a bench trial, Yasmeen Abdulshakur was convicted of three counts of welfare fraud in violation of D.C.Code § 3–218.1 (1988). On appeal, she presents three principal contentions for our consideration. The first, which was her sole defense below, was that the judge should have granted her motion for judgment of acquittal (MJOA) because the evidence was insufficient, according to Ms. Abdulshakur, to prove that she possessed the requisite intent to defraud the District of Columbia. Her second, made for the first time on appeal, is that the District failed to establish that she was not entitled to receive the payments of public assistance which she was convicted of obtaining by fraud. Finally, Ms. Abdulshakur claims in the alternative, also for the first time on appeal, that she could properly be convicted, if at all, of only one crime rather than of three.

The evidence in this case established that for more than six years beginning in May 1979, Ms. Abdulshakur, a college graduate, was employed as a food program specialist by the District of Columbia public schools. On October 16, 1985, she went on maternity leave. Ms. Abdulshakur subsequently applied for public assistance under the AFDC (Aid to Families with Dependent Children) program and received payments under that program for a period of several months. During that period, she also continued to collect, as an employee on leave, exactly the same salary which she had been receiving while she was working fulltime.

Recognizing that she would be ineligible for public assistance while she was being paid her full salary, Ms. Abdulshakur simply lied to the Department of Human Services (DHS) and concealed the salary payments which she had been receiving. Specifically, Ms. Abdulshakur executed and presented to DHS representatives three separate documents, each of which contained several separate false representations regarding the continued receipt of her salary and her financial condition generally. The uncontradicted testimony of three DHS social service representatives established that the public assistance payments which Ms. Abdulshakur received would not have been made but for her false representations; obviously, Ms. Abdulshakur was not entitled to collect the same amount of public assistance at full salary as she would have had the right to receive if, as she represented to DHS, she had been receiving no income. Finding all of Ms. Abdulshakur's contentions to be lacking in merit, we affirm each of her convictions.

I

THE EVIDENCE

Ms. Abdulshakur, who had three children at the time of her application, initially applied for assistance under the AFDC program on November 20, 1985, five weeks after she began her maternity leave. On that occasion, her application was processed by Delores Rainey, the first of several DHS representatives with whom Ms. Abdulshakur was to deal. Ms. Rainey testified that she reviewed Ms. Abdulshakur's pay stub and related financial data and entered the information into the computer, sometimes known as the "Mohawk Machine," which is used by her office to determine an applicant's eligibility to receive AFDC benefits. Ms. Rainey explained that Ms. Abdulshakur was ineligible for the claimed benefits because "her income was

above the 185 percent needed."[1] Ms. Rainey testified that she directed Ms. Abdulshakur to apply for any leave that was available to her from the public school system, and explained that all of Ms. Abdulshakur's resources and income would have to be considered in determining her eligibility for AFDC benefits. According to Ms. Rainey, Ms. Abdulshakur stated that she understood.

Four weeks later, on December 18, 1985, Ms. Abdulshakur applied for public assistance once again. In the application which she completed on this occasion, she made the representations which formed the basis of the first count of the information. On the form, Ms. Abdulshakur stated that she was sick and unable to work, and that she had last worked on October 16, 1985. She represented that she had no money on hand, no checking or credit union account, and no other available resources. She also responded "No" to a question inquiring whether she had "applied for money, other than public assistance, that I have not yet received."

The DHS representative who processed this application, Scott McKnight, testified that he specifically asked Ms. Abdulshakur if she had any income or resources, including checking or savings accounts, insurance policies or automobiles, and that Ms. Abdulshakur responded that she had none. According to Mr. McKnight, Ms. Abdulshakur further told him that she was on leave without pay and that she had received her last payment from the public school system in November 1985.

All of these written and oral representations were false. The prosecution submitted evidence, which was not disputed, that Ms. Abdulshakur had received checks for $612.13 on November 22, 1985 and December 6, 1985, and that these checks were deposited directly in her account at the Teachers Federal Credit Union.

Mr. McKnight testified that, based on Ms. Abdulshakur's representations, all that was required in order to approve her application was documentation that her children were in fact living with her. On December 27, 1985, Ms. Abdulshakur provided Mr. McKnight with the required "living with" statement. She also produced a copy of a letter which she had written on the previous day "To whom it may concern," authorizing the D.C. Public Schools to "use all leave available to me" and requesting that she be advised when "maternity leave begins."

On December 20, 1985, Ms. Abdulshakur had received another check from the public school system, this one for $612.17. She did not report this to Mr. McKnight when she met with him a week later. Deeming himself "bound" to do so "by the rules that we operate under," Mr. McKnight approved Ms. Abdulshakur's application. Mr. McKnight agreed with defense counsel that in determining Ms. Abdulshakur to be eligible, he relied solely on her representation that she had not received any leave pay. Mr. McKnight did require, however, that Ms. Abdulshakur pick up her assistance checks at the DHS office rather than receive them by mail, so that she could report back on the status of her request for leave.[2]

On February 4, 1986, Ms. Abdulshakur came to the DHS office to pick up her checks for December 1985 and for January 1986. On this occasion, she met with Mr. McKnight for a third time. Mr. McKnight testified that he specifically asked Ms. Abdulshakur if any action had been taken on her request for leave, and that she told him that "nothing had come through on that." In fact, Ms. Abdulshakur had received a

---

1. D.C.Code § 3–205.10(a) (1988) provides in pertinent part:

 When the gross family income of persons applying for, or receiving, AFDC exceeds 185% of the standard of assistance for a family of the same composition, the family is not eligible for assistance.

 The "standard of assistance" is derived from a rather complex statutory formula in § 3–205.11.

2. Ms. Abdulshakur testified that she did not receive her checks by mail because DHS officials were under the mistaken impression that she was homeless. It appears, however, that the judge credited Mr. McKnight's testimony with respect to the reason for requiring Ms. Abdulshakur to come to the agency in person.

check for $612.13 on January 17, 1986. Unaware of Ms. Abdulshakur's continued receipt of her salary, however, Mr. McKnight released the two public assistance checks to her.

Three weeks later, on February 25, 1986, Ms. Abdulshakur was requested by Ms. Regina Wells, another DHS representative, to come into the DHS office again to fill out monthly reports for January and February 1986. On both of these forms, Ms. Abdulshakur reported that she had no checking or savings account, that she received no income from work, and that she also received no "money other than from a job" during January and February. Ms. Wells testified that she explained to Ms. Abdulshakur that she was required to report any other money or anything that the client may have received in the reporting months.

Six days prior to completing these monthly report forms, Ms. Abdulshakur had received a check for $646.01 from the District of Columbia Public Schools. Obviously, Ms. Wells was unaware of this payment and of the several that had preceded it. On March 5, 1986, Ms. Wells released the February check to Ms. Abdulshakur. She testified that she did so "on the information that is given on the monthly reports in front of me," which she concisely summarized as "no resources, no income."

In May 1986, a fourth social service representative, Sondra Phillips, called Ms. Abdulshakur into the office for a re-certification interview. Ms. Phillips testified that she had entered Ms. Abdulshakur's social security number into the Mohawk Machine, which revealed that the client was employed by the District of Columbia government and that she had been paid $4,084.85 in wages during the first three months of 1986. Ms. Phillips questioned Ms. Abdulshakur about this information, but the latter responded that "she didn't know any-

thing about the earnings" and "that the information was incorrect." [3]

The District then presented the testimony of representatives of the Financial Management Office of the District of Columbia Public Schools and of the Teachers Federal Credit Union. These witnesses established through their testimony and accompanying documentation that Ms. Abdulshakur had received the various checks which we have described in this opinion and that each had been directly deposited in her credit union account.

Ms. Abdulshakur was the sole witness in her own behalf. She stated that the intake coordinator told her on her first visit to DHS in November 1985 that she was "over income," and therefore ineligible for public assistance, because she was entitled to receive another regular paycheck from the public school system. She testified that in accordance with Ms. Rainey's instructions, she again applied for public assistance on December 18, 1985—the date of her first meeting with Mr. McKnight. She explained that she had reapplied on that occasion, in spite of the fact that she had already received two leave checks, because she believed that these checks were the last which the District of Columbia Public Schools would send her. She acknowledged that although she received another check on December 20, 1985, she did not reveal this to Mr. McKnight when she met with him a week later. She claimed that she did disclose to Mr. McKnight on February 4, 1986 that she had received money from her job, but that he nevertheless released the checks to her and told her they would "straighten it out later."

With respect to the monthly reports for January and February 1986, which she completed on February 25, 1986, Ms. Abdulshakur testified that she asked Ms. Wells whether she should "put the information that I put on the monthly reports the first time I had filled it out [4] and sent

3. It appears from Ms. Phillips' testimony that Ms. Abdulshakur did provide her with pay stubs for some unspecified period. Unfortunately, counsel did not develop this information and the record reveals nothing beyond the bare fact that pay stubs were provided.

4. Ms. Abdulshakur indicated that she had previously completed some monthly forms and sent them to the agency. Ms. Wells referred in her testimony to Ms. Abdulshakur having filled out a "replacement form."

it to them." According to Ms. Abdulsha-kur, Ms. Wells responded in the affirma-tive, and Ms. Abdulshakur wrote what she had written on the original forms. She claimed in essence that she completed the monthly report forms in accordance with Ms. Wells' instructions.

Ms. Abdulshakur testified on cross-exam-ination that she did not disclose the receipt of leave checks on the monthly reports "because I wasn't instructed to." Asked by the prosecutor whether she could read, she responded "Yes I can, pretty well." The cross-examination then ended as fol-lows:

Q And isn't it a fact that you have a college degree?

A Yeah.

Q And isn't it a fact that you have taken some graduate courses at Howard University?

A Yes.

Q So, you must be able to read pretty well.

A No, I read fairly well.

The prosecutor left it at that.

## II

## THE TRIAL COURT'S DECISION

Through counsel, Ms. Abdulshakur made oral motions for a judgment of acquittal, both at the conclusion of the prosecution case and after all of the evidence had been presented. Both motions were based solely on the alleged insufficiency of the evidence of intent to defraud the District. The trial judge denied both motions and heard clos-ing argument, which was likewise exclu-sively directed to the same issue. Follow-ing argument, the judge found Ms. Abdul-shakur guilty of all three counts of welfare fraud.

Analyzing the application filed by Ms. Abdulshakur on December 18, 1985 and comparing it with a printout of her credit union transactions, the judge stated that she was "particularly" struck by the incon-sistencies. In completing the application, Ms. Abdulshakur represented, among other things, that she had no money in a credit union account. Ms. Abdulshakur's credit union transactions disclosed, however, not only that she had money in her account, but also that she knew she had it, for she was writing share drafts against the ac-count in order to pay her bills. The judge noted that the money

> flowed [into the account] every two weeks, and it flowed out by way of share drafts.... So, there could not be any claim of ignorance of the existence of money when one is using it, or at least the claim of that ignorance is misplaced or incredible.

The judge next reviewed the monthly report forms which Ms. Abdulshakur had completed for the months of January and February 1986. Specifically, she examined the particular questions to determine whether there was any ambiguity inherent in their wording. After considering Ms. Abdulshakur's educational background, the judge found that there was nothing in the language of the questions that would con-fuse Ms. Abdulshakur or mislead her as to the information which was being request-ed; DHS obviously wanted to know "where is your money, and how much do you have." The judge ruled that "[t]here is no question that the information asked for in clear and unambiguous language was not answered honestly or truthfully." The judge concluded as follows:

> [T]he Court finds Ms. Abdulshakur inten-tionally withheld critical information from the Department of Human Re-sources about her—about the available money to her in December and in Febru-ary. That is December of 1985 and Feb-ruary of 1986, thereby securing the pay-ments of public assistance to which she was not entitled. We believe, and we find, that Ms. Abdulshakur intentionally, and in a calculated manner, set about to defraud the District of Columbia of wel-fare payments during the course of her maternity leave.

On August 15, 1988, Ms. Abdulshakur was sentenced to serve three concurrent sen-tences of thirty days and to pay a $300 fine. Execution of all of the incarceration except four consecutive weekends in jail

was suspended, and Ms. Abdulshakur was placed on probation. This appeal followed.

### III

### LEGAL ANALYSIS

*A. Sufficiency of the Evidence.*

(1) *Fraudulent intent.*

■ Ms. Abdulshakur's first contention is that the evidence was insufficient to establish beyond a reasonable doubt that she had the requisite intent to defraud the District. We disagree.

Section 3–218.1 is entitled "Fraud in obtaining public assistance; repayment." It reads in pertinent part as follows:

> Any person who, by means of false statement [or] failure to disclose information, ... obtains or attempts to obtain ...: (1) Any grant or payment of public assistance to which he is not entitled; (2) a larger amount of public assistance than that to which he or she is entitled; ... shall be guilty of a misdemeanor and shall be sentenced to pay a fine of not more than $500, or to imprisonment not to exceed 1 year, or both.

This is a welfare fraud statute, and the District must establish that Ms. Abdulshakur's misrepresentations regarding her financial condition were made with knowledge that they were false. *Blackmone v. United States,* 151 A.2d 191, 194 (D.C. 1959).

In *In re T.M.,* 577 A.2d 1149, 1151 (D.C. 1990), we recently articulated as follows the standard applicable to our review of claims of evidentiary insufficiency in the context of a bench trial:

> In evaluating appellants' claim of evidentiary insufficiency, we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences. *Irick v. United States,* 565 A.2d 26, 30 (D.C. 1989); *Langley v. United States,* 515 A.2d 729, 731 (D.C.1986). The government is entitled to the benefit of all reasonable inferences from the evidence, nor may any distinction be drawn be-

tween direct and circumstantial evidence. *Irick, supra,* 565 A.2d at 30; *Driver v. United States,* 521 A.2d 254, 259 (D.C. 1987). Moreover, the evidence need not compel a finding of guilt or negate every possible inference of innocence. *Irick, supra,* 565 A.2d at 30–31. We will reverse on insufficiency grounds only when the government has failed to produce evidence upon which a reasonable mind might fairly find guilt beyond a reasonable doubt. *Langley, supra,* 515 A.2d at 731.

■ We agree with the trial judge's analysis of the evidence regarding Ms. Abdulshakur's intent. Intent is a state of mind, and must ordinarily be proved circumstantially. Criminal Jury Instructions for the District of Columbia, No. 3.02 (3d ed. 1978). Where statements are "knowingly false, and willfully made, the fact that they are material *is* proof of an attempted fraud, because their materiality, in the eye of the law, consists in their tendency to influence the conduct of the party who has an interest in them and to whom they are addressed." *Nelson v. United States,* 97 U.S.App.D.C. 6, 10, 227 F.2d 21, 25 (1955) (quoting *Claflin v. Commonwealth Ins. Co.,* 110 U.S. 81, 95, 3 S.Ct. 507, 515, 28 L.Ed. 76 (1884)), *cert. denied,* 351 U.S. 910, 76 S.Ct. 700, 100 L.Ed. 1445 (1956).

The evidence showed that when Ms. Abdulshakur applied for public assistance on December 18, 1985, she failed to report income which she had received from her employer and falsely indicated that she had no income on hand and no money in a credit union account. In February 1986, when completing additional forms for DHS, she indicated that she had not received any income from her job, or any other income, in spite of the fact that she had received several paychecks from her employer for leave time which she had accrued. Moreover, a printout of Ms. Abdulshakur's credit union transactions demonstrated that she continuously wrote share drafts against the money that was being regularly deposited into her account. Accordingly, the judge could reasonably infer that Ms. Ab-

dulshakur knew that she was receiving income from her employer throughout the relevant time period, but that she intentionally [5] concealed this fact from DHS so that she could receive AFDC benefits.

### (2) Non-entitlement.

■ Section 3–218.1(a) prohibits fraud or attempted fraud in obtaining a grant of public assistance to which [the defendant] is not entitled, or in attempting to obtain "a larger amount of public assistance than that to which he or she is entitled." Counsel for Ms. Abdulshakur did not claim at trial that the District had failed to prove non-entitlement, and the judge explicitly found that Ms. Abdulshakur was not entitled to the payments which she obtained. On appeal, however, Ms. Abdulshakur claims for the first time that non-entitlement is an element of the offense and the evidence was insufficient to show that she received funds to which she was not entitled.[6]

As we have previously noted, Ms. Abdulshakur twice moved for a judgment of acquittal. In doing so, she specified one ground and one ground alone, namely, that the District had failed to prove that she had acted with the proscribed intent. Such a motion invokes the provisions of Super. Ct.Crim.R. 29,[7] and tests the sufficiency of the evidence to sustain the judgment.

■ In general, the grounds for a motion pursuant to Rule 29 need not be stated with specificity unless the prosecutor so requests. *United States v. Jones*, 174 F.2d 746, 748 (7th Cir.1949) (Minton, J.); *see also United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir.1983); *Huff v. United States*, 273 F.2d 56, 60 (5th Cir.1959); 8A MOORE'S FEDERAL PRACTICE ¶ 29.03(1), at 29–8 (2d ed. 1989); 2 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 466, at 653 (2d ed. 1982). Some courts have held, however, that "once the defendant has chosen to specify the grounds upon which he intends to base his motion for judgment of acquittal, he may not later contend that there were other areas upon which his motion for judgment of acquittal would lie." *See State v. Kreps*, 4 Haw.App. 72, 75–76 n. 1, 661 P.2d 711, 714 n. 1 (1983); *see also United States v. Rivera*, 388 F.2d 545, 548 (2d Cir.), *cert. denied*, 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed.2d 1396 (1968). Under the reasoning of *Kreps* and *Rivera*, we could consider a claim of evidentiary insufficiency different from the one articulated by Ms. Abdulshakur in the trial court only upon a clear showing that a miscarriage of justice would otherwise result. *See Hall v. United States*, 343 A.2d 35, 37 (D.C.1975).

This court has never decided the question presented in *Kreps* and *Rivera*, however, and we need not do so here. Even assuming, *arguendo*, that Ms. Abdulshakur adequately preserved the issue relating to the alleged insufficiency of the evidence of non-entitlement,[8] the prosecution satisfied

---

**5.** The testimony of Sondra Phillips to the effect that Ms. Abdulshakur falsely denied receiving the income which the Mohawk Machine showed that she was collecting could reasonably be viewed by an impartial trier of fact as lying to avoid apprehension. Consciousness of guilt, and guilt itself, may fairly be inferred from such evidence. *Irick, supra*, 565 A.2d at 30 n. 8; 2 WIGMORE ON EVIDENCE § 278(2), at 133 (Chadbourn rev. ed. 1979).

**6.** Whether or not Ms. Abdulshakur was entitled to the payments in their entirety appears in substantial part to be a question of law rather than of fact. It is determined by applying a statutory formula. *See* D.C.Code § 3–205.11 (1988). The "payment level" depends on the need determinations; the greater the need, the larger the entitlement. *See* § 3–205.52. In a jury trial, entitlement would be more appropriately decided by the judge than by the jury. For purposes of the present case, however, we will

assume without deciding that non-entitlement is sufficiently fact-bound to constitute an element of the crime, and that the District must prove it beyond a reasonable doubt.

**7.** Super.Ct.Crim.R. 29 is identical in relevant respects to Rule 29 of the Federal Rules of Criminal Procedure.

**8.** This court has held that the rule requiring the defendant to make a motion for a judgment of acquittal in order to preserve on appeal the question of evidentiary sufficiency applies in jury trials, *Richardson v. United States*, 276 A.2d 237, 238 (D.C.1971), but apparently not in bench trials. *In re J.N.H.*, 293 A.2d 878, 880 (D.C. 1972). We have not, however, ruled on the proper standard of review where the defendant has made such a motion despite the lack of necessity therefor, but has added a new ground on appeal.

its burden of proof on that issue. Since section 3–218.1(a) applies to one who obtains *or attempts to obtain* [9] public assistance by fraud, and since it proscribes such attempts with respect to "a larger amount of public assistance than that to which [the defendant] is entitled," it was sufficient for the District to prove beyond a reasonable doubt that Ms. Abdulshakur tried to obtain from DHS more money than any amount properly payable to her. It surely transports us to a world of make-believe, if not to the "eerie atmosphere of never-never land," *Meredith v. Fair*, 298 F.2d 696, 701 (5th Cir.1962), to suggest that a person who had been receiving her full salary, but who represented to DHS that she was receiving *no* salary, was not thereby attempting to obtain from the agency more money than she was due. *Cf. State v. Moore*, 238 Or. 117, 119, 393 P.2d 180, 181 (1964) ("it would appear rather ridiculous to wonder if a family possessing an income for the 12 months preceding the application was entitled to public assistance").[10] Even a superficial examination of relevant statutory provisions, and particularly of sections 3–205.11 and 3–205.52, demonstrates that Ms. Abdulshakur's contention lacks merit.

■ Nor was the District's proof technically defective. Ms. Rainey testified that, according to the "Mohawk Machine" computer, Ms. Abdulshakur's income exceeded 185% of the standard of assistance applicable to her family.[11] Assuming that this was hearsay, there was no objection, and "[h]earsay evidence admitted without ob-

jection may be properly considered by the trier of fact and given its full probative value." *Mack v. United States*, 570 A.2d 777, 782 (D.C.1990) (citation omitted). Mr. McKnight also testified that he authorized payment to Ms. Abdulshakur solely on the basis of her misstatements; the only reasonable inference is that he would have regarded her as ineligible if the facts had been represented correctly. Ms. Wells' testimony was to the same effect. "Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties." *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960); E. CLEARY, MCCORMICK ON EVIDENCE § 343, at 969 (3d ed. 1984); *see also Eilers v. District of Columbia Bureau of Motor Vehicles*, 583 A.2d 677, 684 (D.C.1990). If there was any evidence which could be viewed as suggesting that the computer and the DHS officials were wrong, see note 3, *supra*, it was not developed, and the trial judge evidently did not find it persuasive. The District therefore proved Ms. Abdulshakur's non-entitlement beyond a reasonable doubt.[12]

### B. Alleged Multiplicity of Counts.

■ Finally, Ms. Abdulshakur contends, again for the first time on appeal, that if her conduct was in violation of the law at all, it represented one offense rather than three. Relying primarily on *Blackmone*,

---

9. Ms. Abdulshakur further claims, also for the first time on appeal, that she was improperly convicted because correct information about her pay was available to DHS, and that the agency's reliance on her false statements was therefore unreasonable. Since the statute proscribes *attempts* to obtain assistance to which the applicant is not entitled, this contention is altogether without merit. *See People v. Bonner*, 55 Ill.App.3d 411, 415, 13 Ill.Dec. 383, 385–386, 371 N.E.2d 78, 80–81 (1977).

10. Obviously, a dollar was worth more in 1964 than it is today.

11. Ms. Abdulshakur's initial application, which Ms. Rainey rejected, reflected the same essential facts as the later one with respect to which she secured payment from Mr. McKnight.

12. The authorities on which Ms. Abdulshakur relies are not in point. *People v. Dixon*, 46 Cal.App.3d 431, 435, 120 Cal.Rptr. 163, 165 (1975), concerned a statute whose target, unlike that of our legislation, "is the false receipt of health care *and not the false report that may make the false receipt possible*." (Emphasis added). In *People v. Hubbard*, 10 A.D.2d 735, 199 N.Y.S.2d 206 (2d Dept.1960), there was no evidence that the appellant's wife could have supported him; his misrepresentation that he was single thus failed to show nonentitlement. *People v. Hunter*, 34 N.Y.2d 432, 138, 315 N.E.2d 436, 439, 358 N.Y.S.2d 360, 364 (1974) stands for the proposition, among others, that "[t]he rebuttable presumption is that concealment [of a material fact] enables a person to obtain welfare assistance to which he is not entitled."

*supra,* she maintains that, at most, one single crime of a continuing nature was charged and proved. We disagree.

Section 3–218.1 provides among other things that any person who, by fraudulent means, attempts to obtain a larger amount of money than that to which he or she is entitled is guilty of a misdemeanor. Construing the words of the statute in their literal sense, and according them their conventional everyday meaning, *see Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1235 (D.C.1990), one would surely conclude that the first such attempt is one crime, the second is another crime, and so on. "[S]uccessive acts, no matter how close in time, constitute separate offenses." *United States v. Hawkins,* 794 F.2d 589, 590 (11th Cir.1986).

The literal meaning of the statute also comports with reason and with sound public policy. The construction for which Ms. Abdulshakur contends would mean that once a defendant has made a single fraudulent representation (and perhaps secured a single payment to which he or she is not entitled) any future misrepresentations could be made with impunity; they would simply be treated as a part of one criminal scheme. Under Ms. Abdulshakur's theory, as a result, a defendant who made thirty-six separate misrepresentations on the first day of each month for three years, and who received thirty-six checks to which he or she was not entitled, would be subject to the same maximum penalty as a more timorous or less venal counterpart who lied only once and who secured but one forbidden payment. There would be no incentive for the defendant not to do it again (and again and again).

■ This is surely not a result which the legislature intended.[13] Courts avoid interpretations of statutes which lead to implausible results, even where resort to the dictionary would sustain such implausibility (which, in this case, it assuredly does not). *See United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948); *J.*

*Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 46 (D.C.1989). Although the rule of lenity applies where there is any ambiguity in a criminal enactment with regard to the proper unit of prosecution, the statutory language must be read with the "saving grace of common sense." *Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *Riggs, supra,* 581 A.2d at 1262. That saving grace surely inhibits our favorably entertaining Ms. Abdulshakur's proposed construction of our welfare fraud legislation.

The courts, including this one, have sustained prosecution for multiple offenses where a defendant has repeated his unlawful conduct, even though the various offenses could be viewed as part of a single scheme. In *Baldwin v. District of Columbia,* 183 A.2d 566 (D.C.1962), for example, we affirmed the defendant's conviction of two counts of practicing podiatry without a license, where he treated two separate individuals a month apart. In *Bruce v. United States,* 471 A.2d 1005, 1007 (D.C.1984), we stated, albeit in dictum, that a defendant may be prosecuted for two counts of carrying a pistol without a license where the continuity of the first violation has been interrupted (*e.g.* by taking the pistol to his home, where possession is lawful) and a second "carrying" has followed. In *United States v. Williams,* 685 F.2d 319, 321 (9th Cir.1982), the court held that the defendant was properly convicted of seven separate offenses after he had made false statements on seven separate transaction forms with respect to firearms purchased on five separate occasions; *see also Hawkins, supra,* 794 F.2d at 590 ("each firearms transaction form was a proper unit of prosecution").

In *Ebeling v. Morgan,* 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915), the petitioner had, on a single occasion, broken into six separate government mail bags for the purpose of appropriating their contents. He

---

**13.** The parties and *amici* have not cited any legislative history, and we have found none, relevant to the point under discussion.

was convicted of six counts of violating a statute providing in pertinent part that

> [w]hoever shall ... cut, or otherwise injure any mail bag ... with intent to ... steal any such mail ... shall be fined ... or imprisoned ... or both.

*Id.* at 629, 35 S.Ct. at 711. The Supreme Court held that in spite of the fact that the various intrusions into separate mail bags were part of a single scheme, multiple convictions were proper. Analyzing the statutory language, the Court stated:

> These words plainly indicate that it was the intention of the lawmakers to protect each and every mail bag from felonious injury and mutilation. Whenever any one mail bag is thus torn, cut or injured, the offense is complete. Although the transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut in the manner described, with the intent charged. The offense as to each separate bag was complete when that bag was cut, irrespective of any attack upon, or mutilation of, any other bag.

*Id.* The Court continued:

> So here, proof of cutting and opening one sack completed the offense, and although defendant continued the operation by cutting into other sacks, proof of cutting one sack would not have supported the counts of the indictment as to cutting the others; nor was there that continuity of offense which made the several acts charged against the defendant only one crime.

*Id.* at 631, 35 S.Ct. at 712.

*Ebeling* may be a marginally easier case for the prosecution, in light of the allusion in the statute to "any mail bag" in the singular, but we think that its reasoning nevertheless applies here. An offense was complete whenever Ms. Abdulshakur submitted a false statement (and received benefits based on that statement). Indeed, a proscribed attempt was complete even before the benefits were paid. Although her scheme to defraud the District government was in a sense continuous—she made repeated misrepresentations over a period of several months—a separate statutory offense was committed each time she filed a false application or monthly statement.[14]

In *Blackmone,* the principal authority on which Ms. Abdulshakur relies, the defendant falsely represented to the Department of Public Welfare in March 1955 that her husband had deserted her. From April 1955 to February 1958, she received welfare checks which would not have been issued but for that misrepresentation. She was initially charged with thirty-five separate violations of the predecessor to what is now section 3–218.1. The trial judge directed a verdict in favor of Ms. Blackmone on all but two counts, and the jury convicted her of the remaining two counts. On appeal, this court held that "only a single crime of a continuing nature was charged here rather than a series of crimes." 151 A.2d at 195. The court so ruled *sua sponte* notwithstanding the failure of the defendant to raise the issue either in the trial court or on appeal.

In reaching this result, the court relied heavily on *Bramblett v. United States,* 97 U.S.App.D.C. 330, 231 F.2d 489, *cert. denied,* 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956). In *Bramblett,* the defendant (a Congressman) had received several payments to which he was not entitled, all as a result of "the same false statement."[15] The United States Court of Appeals held that on these facts the rule of lenity precluded "subjecting an offender to multiple convictions by reason of a single unified

---

14. The District also relies on *Lewis v. United States,* 389 A.2d 306 (D.C.1978) (per curiam), and *Skantze v. United States,* 110 U.S.App.D.C. 14, 288 F.2d 416, *cert. denied,* 366 U.S. 972, 81 S.Ct. 1938, 6 L.Ed.2d 1261 (1961), in which multiple convictions of false pretenses were affirmed on facts roughly comparable to those here. In neither case, however, was the issue whether each single defalcation was a proper unit of prosecution raised or discussed by the court. At most, these decisions support the proposition that this court is not required, *sua sponte,* to vacate multiple convictions in such cases.

15. The quoted language is from the description of *Bramblett* in *Blackmone, supra,* 151 A.2d at 194.

pattern of behavior even though the behavior continues over a period of time." *Bramblett, supra*, 97 U.S.App.D.C. at 332, 231 F.2d at 491, *quoted in Blackmone, supra*, 151 A.2d at 195.[16]

The decision in *Blackmone* was thus predicated on the court's assumption that Mrs. Blackmone, like Congressman Bramblett, had made a single misrepresentation which had resulted in her receiving several payments to which she was not entitled. Indeed, there was only one fact misrepresented, namely, that Mrs. Blackmone's husband had deserted her. Throughout its analysis, the court referred to the defendant's false statement in the singular. The court observed, for example, that "[i]t is, of course, conceded that Mrs. Blackmone made the *representation* in March 1955 that her husband had deserted her, and that as a result of her *statement* she received various allowances from the Department of Public Welfare." 151 A.2d at 196 (emphasis added).[17] The opinion simply does not address the issue presented here, namely, whether *multiple* misrepresentations resulting in the receipt of *multiple* payments for which Ms. Abdulshakur was ineligible constitute multiple offenses or only a single crime.[18] Indeed, in her own Reply Brief, Ms. Abdulshakur synopsizes *Blackmone* as follows:

*Blackmone* also makes clear that the receipt of several checks *following a single false statement or failure to disclose information* results in only one violation of the law.

(Emphasis added).

The present case differs from *Blackmone* in a decisive respect. Ms. Abdulshakur made misrepresentations on three different forms, each form applying to a different period of time. To put the matter plainly, she told different lies about her finances in completing each form. In December 1985, she misrepresented her assets as of then and failed to disclose payments which she had received in the period preceding the December application. On the January and February forms, she made false statements as to her financial condition during those months, and concealed salary payments which she had received after the December application was filed. Under these circumstances, *Blackmone* cannot be and is not controlling.

Several cases from other jurisdictions have been brought to our attention by *amici curiae*, three defendants who are facing charges in the Superior Court similar to those of which Ms. Abdulshakur stands convicted. Although two of these decisions provide no enlightenment with respect to the issues here presented,[19] two others merit discussion.

---

16. In *Bramblett*, the court recognized that where the gravamen of the charge, as in the present case, is the making of misrepresentations, then each such misrepresentation constitutes an offense. Distinguishing *Marzani v. United States*, 83 U.S.App.D.C. 78, 168 F.2d 133, *aff'd*, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948), the court stated in *Bramblett* that in *Marzani*,

the indictment charged the making of false representations, not a falsifying by a continuing scheme. When the falsifications were made the crime charged was complete.

97 U.S.App.D.C. at 333, 231 F.2d at 492.

17. *See also* 151 A.2d at 194 ("second allowance ... obtained ... based on the same *fraud*"), *id.* at 194–95 ("the same false *statement*"; the reference is to *Bramblett*); *id.* at 195 ("months following the making of the false *statement*, during which the *statement* was continued in force"; the reference once more is to *Bramblett*). (All italics in this footnote have been added by the writer.)

18. Arguably, Ms. Blackmone made a new implicit misrepresentation each time she signed for a new check, but the court did not discuss this possibility. As the Supreme Court pointed out in *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925),

[t]he most that can be said is that the point was in the [case] if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

*Accord, Thompson v. United States*, 546 A.2d 414, 423 n. 14 (D.C.1988).

19. In *State v. Ermert*, 25 Wash.App. 682, 611 P.2d 1286 (1980), the defendant was *charged* with a single count of grand larceny after signing several false monthly reports; a prosecutor's charging decision does not provide judicial precedent. Moreover, the decision was reversed by the Supreme Court of Washington. *State v. Ermert*, 94 Wash.2d 839, 621 P.2d 121 (1980).

In *People v. Keehley*, 193 Cal.App.3d 1381, 239 Cal.Rptr. 5 (1987), the defendant was charged with a single count of welfare fraud. The court held that, for purposes of the statute of limitations, the filing by an applicant for public assistance of false monthly reports with the welfare authorities, in which she did not disclose that she was receiving social security payments, constituted a single continuing offense, rather than a series of individual crimes. *Id.* at 1385–1386, 239 Cal.Rptr. at 8. *Cf. Ebeling, supra,* 237 U.S. at 629, 35 S.Ct. at 711. The court also stated, by way of dictum, that the prosecutor was precluded in such circumstances from charging multiple counts. *Id.* Since the issue before the court was whether a single prosecution was time-barred, rather than whether separate counts were maintainable, the court never had occasion to consider the implications of a rule which would give a defendant who made the first misrepresentation, and who received the first payment, a "free ride" if he or she then repeated the offense in later months. *Keehley* is not persuasive authority on a question that was not presented and could not be decided. *See Webster, supra,* 266 U.S. at 511, 45 S.Ct. at 149.

In *State v. Martin*, 62 Haw. 364, 616 P.2d 193 (1980) (per curiam), the defendant was convicted of a single count of theft in the first degree. In successive applications for public assistance, Ms. Martin had misrepresented facts relevant to her entitlement. Rejecting the defendant's contention that the prosecution could not be brought pursuant to a statute which had become effective after the fraud was initiated, the court held that "the State acted within legal bounds in prosecuting defendant under an indictment covering only part of the entire duration of a continuing offense." *Id.* at 370, 616 P.2d at 197. In reaching this decision, the court stated:

> We do not view each filing by defendant of a statement of facts supporting continued eligibility as *necessarily* constituting a new offense, since all statements were identical, representing that defendant was unmarried, unemployed, and not receiving social security benefits.

*Id.* at 369, 616 P.2d at 197 (emphasis added).

It cannot be gainsaid that, viewed in isolation, the quoted language is marginally helpful to Ms. Abdulshakur's cause. The court's use of the word "necessarily," however, indicates that the question in the present case was not being decided. Moreover, as in *Keehley*, the court was not dealing with the point in a context in which the defendant's potential "free ride" for additional wrongdoing was presented, and the decision cannot be viewed as dispositive of an issue not argued or discussed.

After deceiving the Department of Human Services in December, Ms. Abdulshakur had the opportunity to put an end to her fraudulent activities. Instead, she returned and completed a mendacious form as to January. Having done that, she proceeded to tell more lies on the form for February. We cannot attribute to the legislature the intention to enact a rule of law which would enable a defendant to commit with impunity the second and third crimes and, by implication, many more.

## IV

## CONCLUSION

For the foregoing reasons, the judgment appealed from must be and it is hereby

*Affirmed.*

---

In *John v. State*, 96 Wis.2d 183, 291 N.W.2d 502 (1980), the court held that the violation of a criminal statute requiring a welfare recipient to report changes in her status relevant to eligibility was a continuing offense; a continuing failure to disclose obviously differs in that respect from consecutive affirmative misrepresentations which concealed several different salary payments.